UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
J.D. and L.D., individually and on behalf of          :
A.D.,                                                 :
               Plaintiffs,            :
                                    :          **<u>OPINION AND ORDER</u>**
v.                                                    :
                                    :          22 CV 3039 (VB)
RYE NECK UNION FREE SCHOOL                            :
DISTRICT,                                             :
               Defendant.             :
-------------------------------------------------------------x

<u>Briccetti, J.</u>:

Plaintiffs J.D. and L.D. (the "Parents"), the parents of student A.D., a child with a disability as defined by the Individuals with Disabilities Education Act, 20 U.S.C. § 1400 ("IDEA"), bring this action against the Rye Neck Union Free School District (the "District") pursuant to the IDEA.

The Parents seek reversal of the New York State Education Department state review officer's ("SRO") decision affirming the impartial hearing officer's ("IHO") decision, which found the District offered A.D. a free appropriate public education ("FAPE") for the 2019–2020 (third grade) and 2020–2021 (fourth grade) school years and denied the Parents' request for tuition reimbursement.  The District seeks to uphold the SRO's decision.

Now pending is the Parents' motion for summary judgment.  (Doc. #18).

For the reasons set forth below, the motion is DENIED and the SRO's decision is AFFIRMED.

The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331.

## BACKGROUND

I.    Statutory Framework

The IDEA was enacted to promote the education of disabled children.  20 U.S.C.

§ 1400(d)(1)(A); see Bd. of Educ. of the Hendrick Hudson Cent. Sch. Dist. v. Rowley, 458 U.S.

176, 179 (1982) (interpreting predecessor statute to IDEA).[1]  States receiving federal funds are

required to provide a FAPE to children with disabilities.  20 U.S.C. § 1412(a)(1)(A).  Public

school districts must provide "'special education and related services' tailored to meet the unique

needs of a particular child, [which are] 'reasonably calculated to enable the child to receive

educational benefits.'"  Walczak v. Fla. Union Free Sch. Dist., 142 F.3d 119, 122 (2d Cir. 1998)

(first quoting 20 U.S.C. § 1401(a)(18); then quoting Bd. of Educ. of the Hendrick Hudson Cent.

Sch. Dist. v. Rowley, 458 U.S. at 207).

States have an obligation under the IDEA to identify, locate, and evaluate "[a]ll children

with disabilities residing in the State" to determine whether they require special education and

related services.  20 U.S.C. § 1412(a)(3)(A); see Handberry v. Thompson, 446 F.3d 335, 347 (2d

Cir. 2006).  This so-called "child find" obligation extends to "[c]hildren who are suspected of

being a child with a disability."  34 C.F.R. § 300.111(c)(1).

The IDEA requires states to create an individualized education program ("IEP") for each

disabled student.  See 20 U.S.C. § 1412(a)(4); see also Frank G. v. Bd. of Educ. of Hyde Park,

459 F.3d 356, 363 (2d Cir. 2006) ("The key element of the IDEA is the development of an IEP

for each handicapped child.").  The IEP is a "comprehensive statement of the educational needs

of a handicapped child and the specially designed instruction and related services to be employed

_____

[1]        Unless otherwise indicated, case quotations omit all internal citations, quotations,
footnotes, and alterations.

to meet those needs."  Sch. Comm. of Burlington v. Dep't of Educ., 471 U.S. 359, 368 (1985)

(citing 20 U.S.C. § 1401(19)).

In New York, the state has assigned responsibility for developing IEPs to local

Committees on Special Education ("CSE").  See N.Y. Educ. Law § 4402(1)(b)(1); R.E. v.

N.Y.C. Dep't of Educ., 694 F.3d 167, 175 (2d Cir. 2012).  "CSEs are comprised of members

appointed by the local school district's board of education, and must include the student's

parent(s), a regular or special education teacher, a school board representative, a parent

representative, and others."  R.E. v. N.Y.C. Dep't of Educ., 694 F.3d at 175.  "The CSE must

examine the student's level of achievement and specific needs and determine an appropriate

educational program."  Id.

The IDEA requires a school district to send prior written notice to a child's parents when

the school district proposes, or refuses, to initiate or change "the identification, evaluation, or

educational placement of the child, or the provision of a [FAPE] to the child."  20 U.S.C.

§ 1415(b)(3).  If the parents believe the state failed to provide a FAPE to a disabled child, the

parents may enroll the child in a private school and seek reimbursement for the cost of the

private school from the local board of education.  See 20 U.S.C. § 1412(a)(10)(C); Sch. Comm.

of Burlington v. Dep't of Educ., 471 U.S. at 369–70, 374.  The parents must provide notice ten

business days before removing the child from the public school.  20 U.S.C. § 1412(a)(10)(C)(iii).

In New York, parents seeking such reimbursement must then file a "due process

complaint" challenging the appropriateness of the IEP.  FB v. N.Y.C. Dep't of Educ., 923 F.

Supp. 2d 570, 577 (S.D.N.Y. 2013).  A school district must respond within ten days of receiving

the complaint, unless the school district has already sent prior written notice to the parent

regarding the subject matter of the due process complaint.  20 U.S.C. § 1415(c)(2)(B)(i)(I); 34

3

C.F.R. § 300.508(e).  The school district's response must address the issues raised in the complaint and include specific information outlined in 20 U.S.C. § 1415(c)(2)(B)(i).

Separately, a school district must convene a resolution meeting within fifteen days of receiving notice of the parents' due process complaint.  20 U.S.C. § 1415(f)(1)(B)(i); 34 C.F.R. § 300.510(a)(1).  "The purpose of the meeting is for the parent of the child to discuss the due process complaint, and the facts that form the basis of the due process complaint, so that the [school district] has the opportunity to resolve the dispute that is the basis for the due process complaint."  34 C.F.R. § 300.510(a)(2).  The school district has thirty days from receipt of the complaint to "resolve[] the complaint to the satisfaction of the parents."  20 U.S.C. § 1415(f)(1)(B)(ii).  If the parties resolve the complaint, they must execute a legally binding agreement, signed by the parents and a school district representative, that sets forth the resolution.  Id. § 1415(f)(1)(B)(iii).  If the parties fail to resolve the complaint, they may proceed with a due process hearing.  Id. § 1415(f)(1)(B)(ii).

An IHO conducts the due process hearing on the parents' complaint.  See N.Y. Educ. Law § 4404(1).  A public school district is required to reimburse parents for private educational services if:  (i) the district fails to establish the student's IEP provided a FAPE; (ii) the parents establish the unilateral placement selected by the parents was appropriate; and (iii) equitable considerations favor the parents' claim.  See Florence Cty. Sch. Dist. Four v. Carter, 510 U.S. 7, 12–16 (1993); M.W. ex rel. S.W. v. New York City Dep't of Educ., 725 F.3d 131, 135 (2d Cir. 2013).  The IHO's decision may be appealed to an SRO at the New York State Education Department.  See N.Y. Educ. Law § 4404(2); see also 20 U.S.C. § 1415(g).  The SRO's decision may then be challenged in federal court.  See 20 U.S.C. § 1415(i)(2)(A).

II.   Factual Background

The parties have submitted briefs, a Joint Statement of Material Facts pursuant to Local Rule 56.1, and the record and exhibits from the IHO and SRO proceedings, which reflect the following factual background.[2]

A.D. is a student with a disability as defined by the IDEA.

A.D. attended a District elementary school from kindergarten through second grade, before enrolling at the Windward School ("Windward"), a private school in White Plains, New York, for third and fourth grade (the 2019–2020 and 2020–2021 school years, respectively). Windward is not approved as a New York State Department of Education special education school.

During her kindergarten and first grade years, A.D. was not subject to an IEP.  In first grade (the 2017–2018 school year), she began receiving academic intervention services ("AIS") in reading and math and a thirty-minute speech and language therapy session once per week.  A member of the school's instructional support team referred A.D. to the CSE due to concerns about her learning and retention of academic concepts, and recommended comprehensive evaluations.

On June 20, 2018, the District convened a CSE meeting to determine A.D.'s eligibility for special education services.  The Parents attended and participated in the meeting.

---

[2]      Citations to the "IHO Decision" refer to the IHO's Findings of Fact and Decision, dated September 17, 2021.  (Doc. #24-2).  Citations to the "SRO Decision" refer to the SRO's Decision, dated December 15, 2021.  (Doc. #24-1).  Citations to "Tr." refer to the transcript of the hearing before the IHO.  (Doc. #24-3).  Citations to "P-[ ]" refer to the Parents' Exhibits (Doc. #25-1) and citations to "D-[ ]" refer to the District's Exhibits (Doc. #24-4) comprising the record before the IHO.  Although the District's Exhibits 1 through 20 appear to have been inadvertently omitted from the file uploaded to the Court's Electronic Case Filing system, the Court received a hard copy of these exhibits and considers them in ruling on the Parents' motion for summary judgment.

The CSE classified A.D. as a student with a learning disability and developed an IEP for the 2018–2019 school year (second grade).  The CSE determined A.D. needed small group, pull-out instruction[3] in reading, writing, and math, and would benefit from the use of models, visuals, and repetition of materials.  Accordingly, the CSE recommended placing A.D. in a general education class, with supports including:  forty-five minutes of resource room services four times per week, forty minutes of specialized reading instruction every day, and thirty minutes of speech/language therapy, all in a small group.  The CSE also recommended supplementary aids and services including multisensory techniques and preteach/reteach of the curriculum.

In April 2019, A.D.'s general education teacher and the District's school psychologist met with the Parents to advise them of A.D.'s progress and her occasional regression in math over breaks from schooling, including over long weekends.

A.     2019–2020 School Year

On May 21, 2019, the CSE met to review A.D.'s performance during the 2018–2019 school year and develop her IEP for the 2019–2020 school year (third grade).  The Parents attended and participated in the meeting.

The CSE determined A.D. required "small group support both in the general education classroom and in a small group pull out setting using a multi-sensory approach to learning."  (D-22 at 8).  Accordingly, the CSE recommended an integrated co-teach ("ICT") class for math and English language arts ("ELA") and a general education class for science and social studies, with supports including: forty minutes of specialized reading instruction four times per week, thirty minutes of specialized math instruction three times per week, and thirty minutes of

---

[3]     In a "pull-out" model, a specialist provides instructional support or related services, to one student or a small group, in a separate setting outside of the general education classroom.  Conversely, in a "push-in" model, a specialist provides those services in the classroom.

speech/language therapy twice per week.  Because A.D.'s math skills regressed over breaks, the CSE also recommended specialized math instruction for six weeks during the summer.  In addition, the CSE recommended A.D. receive encouragement to attempt tasks she perceived as difficult.

The Parents, who were dissatisfied with the May 2019 IEP, hired Dr. Susan Adler to perform a private neuropsychological evaluation of A.D.  Dr. Adler evaluated A.D. over three days in early June 2019, but did not reach out to District staff for input or observe A.D. in a classroom.  Based on her evaluation, Dr. Adler diagnosed A.D. with dyslexia, attention-deficit/hyperactivity disorder ("ADHD"), and potential anxiety.  Dr. Adler also found deficiencies in A.D.'s reading and math skills, as well as her verbal comprehension of information.  In her report, Dr. Adler set forth specific recommendations to address A.D.'s needs, including multisensory instruction and extensive remediation in reading using a phonemic approach such as the Orton-Gillingham method.

On June 19, 2019, the Parents signed a tuition contract with Windward for the 2019–2020 school year.  They paid Windward $5,000 on June 28, 2019; $28,112.50 on July 11, 2019; and $28,112.50 on December 5, 2019.

On August 15, 2019, the Parents informed the District they disagreed with the May 2019 IEP, and intended to unilaterally place A.D. at Windward for the 2019–2020 school year and seek reimbursement from the District for the cost of tuition.

On September 3, 2019, the CSE reconvened to discuss the Parents' concerns and review Dr. Adler's report.  A.D.'s parents attended and participated in the meeting, as did Dr. Adler, who discussed her findings and recommendations.  According to the meeting notes, Dr. Adler recommended A.D. be placed at Windward to support her language-based learning needs, and

stated she included this recommendation "at the specific request of" the Parents.  (D-11 at 2).

Although A.D.'s father testified they "never" made that request (Tr. at 974), Dr. Adler's June

2019 evaluation states, under "Reason for Referral," that "[A.D.]'s parents are interested in the

Windward School."  (D-16 at 1).

The CSE continued to recommend A.D. be placed at a District school, in an ICT class for

math and ELA and a general education class for science and social studies.  However, the CSE

made several adjustments to the May 2019 IEP based on the Parents' concerns and Dr. Adler's

recommendations.  For example, the CSE added a teaching assistant cluster for science and

social studies, increased specialized reading instruction sessions to five per week, and changed

one of the speech/language therapy sessions to a push-in model.  The September 2019 IEP also

recommended additional supports including:  access to a computer or word processor for

classroom and homework assignments, books on tape, prompting during new lessons and

assignments, wait time for A.D. to process information, repetition of directions, and extra time to

complete assignments.

The Parents declined to follow the CSE's recommendations and unilaterally placed A.D.

at Windward for the 2019–2020 school year.

On February 5, 2020, the Parents filed a due process complaint notice claiming the

District failed, procedurally and substantively, to offer A.D. a FAPE for the 2019–2020 school

year.  Specifically, the Parents alleged the District predetermined A.D.'s placement, preventing

the Parents from meaningfully participating in the CSE process, and did not offer an appropriate

IEP.[4]  The Parents sought reimbursement for A.D.'s tuition at Windward.

---

[4]      The due process complaint notice also claimed the District did not fully evaluate A.D.'s
disabilities and present levels of performance.  The Parents later brought a similar claim
regarding the 2020–2021 school year.  The IHO denied this claim with respect to both years, as

B.      2020–2021 School Year

On February 16, 2020, while the due process complaint notice was pending, the Parents executed a contract to enroll A.D. in Windward for the 2020–2021 school year (fourth grade).

On May 20, 2020, the CSE met to conduct A.D.'s annual review and develop her IEP for the 2020–2021 school year.  The Parents attended and participated in the meeting, as did a representative from Windward, who provided input on A.D.'s progress and needs.

The CSE again recommended placing A.D. at a District school, in an ICT class for math and ELA, and a general education class for science and social studies with a teaching assistant cluster.  The IEP also provided for related services including:  forty minutes of specialized reading instruction five times per week, sixty minutes of specialized reading instruction for decoding and comprehension three times per week, thirty minutes of specialized math instruction three times per week, and thirty minutes of speech/language therapy twice per week (once in the classroom, and once outside the classroom), with specialized math and reading instruction continuing over the summer.  The supplementary aids and services were the same as those in the September 2019 IEP.

On August 14, 2020, the Parents informed the District they disagreed with the May 2020 IEP and intended to send A.D. to Windward for the 2020–2021 school year and seek tuition reimbursement.

On August 28, 2020, the CSE reconvened to discuss the Parents' concerns.  The Parents

_____

did the SRO, who concluded the District's failure to perform an assistive technology evaluation "does not rise to the level of a denial of a FAPE" because the IEPs recommended A.D. have access to assistive technology.  (SRO Decision at 11).  The Parents do not appear to appeal this determination.  However, for the avoidance of doubt, the Court agrees with the SRO's conclusion, which is well-reasoned and supported by a preponderance of evidence in the record. See R.E. v. N.Y.C. Dep't of Educ., 694 F.3d at 184.

attended and participated in the meeting.  The CSE retained the recommendations from the May

2020 IEP, but added thirty minutes of individual counseling with a psychologist once per week.

The CSE also proposed additional testing to obtain updated information about A.D.'s needs

before discussing any further recommendations.  According to the August 2020 meeting notes, a

12:1:1 special class program was discussed and offered as an option, but the Parents said they

did not feel the special class program was appropriate because the students in the class were

lower functioning than A.D.  The Parents maintained A.D.'s placement at Windward.

The District conducted educational testing and a reading assessment of A.D. over two

days in September 2020.  The results, when compared to testing conducted in June 2019,

indicated A.D. had not made progress in math and had regressed in spelling.  In reading, A.D.

"showed similar performance or improved" with respect to phonological processing, compared

to a May 2019 assessment; her phonological awareness in particular "greatly improved."  (D-2 at

2).  However, her independent reading level was unchanged.

The CSE reconvened on October 2, 2020, to review the updated information about A.D.'s

academic levels and functioning.  The Parents attended and participated in the meeting.  Based

upon the updated testing information, the CSE found A.D. "would benefit from a more intensive

program to develop her reading and decoding skills" and more support in math.  (D-2 at 2–3).

Accordingly, the CSE recommended A.D. be placed in a special class for math and ELA, with

direct reading instruction using a Preventing Academic Failure ("PAF") program.  The CSE also

adjusted the math goals in the IEP, as recommended by the special education teacher who

conducted the educational testing.

The CSE continued to recommend a general education class for science and social studies with a teaching assistant cluster.  In addition, the CSE retained the other supports listed in the August 2020 IEP, and added a recommendation that spelling be waived on writing assignments.

The Parents again declined to follow the CSE's recommendations.  A.D. remained at Windward for the entire 2020–2021 school year.

On December 1, 2020, the Parents filed a second due process complaint notice, similarly challenging the procedural and substantive adequacy of the 2020–2021 IEPs and seeking reimbursement for A.D.'s second year at Windward.

The parties agreed to consolidate both due process complaint notices, and on December 10, 2020, the IHO issued an interim order consolidating the matters.

III.    Procedural Background

A.    IHO Hearing and Decision

IHO Audrey Daniel, Esq., M.S.Ed., presided over a due process hearing spanning six days between April 28 and June 23, 2021 (the "IHO Hearing").  Ten witnesses testified during the hearing, including A.D.'s father, the District's school psychologist, members of A.D.'s CSE, a Windward representative, and Dr. Lydia Soifer, a pediatric literacy and education programming specialist who served as the Parents' expert witness but did not formally evaluate A.D.  On September 17, 2021, the IHO issued a decision concluding the District offered A.D. a FAPE for the 2019–2020 and 2020–2021 school years and denying the Parents' request for reimbursement.

The IHO first addressed the Parents' claim that the IEPs were procedurally inadequate because the CSE predetermined its recommendations based on what programming was available in the District rather than what would be appropriate for A.D.

The IHO found the District did not predetermine A.D.'s placement and the Parents had the opportunity to meaningfully participate in the IEP process for both years. The IHO noted the Parents participated in all five CSE meetings over the two-year period and brought along experts who spoke about A.D.'s needs and provided recommendations to the CSE. The IHO also cited "uncontroverted" testimony from the District's Administrator of Special Services, Diane Santangelo, that, in her experience, students have not needed an ICT class for social studies and science in third grade, and have performed well in a general education class with additional supports, but "[i]f a student required co-taught social studies and science, we would have developed one." (IHO Decision at 14, 16). In addition, the IHO cited the September 2019 meeting summary, which noted A.D.'s grade-level performance in those subjects.

According to the IHO, the record did not support the Parents' allegation that the District refused to consider A.D.'s need for a smaller class size. The IHO noted Dr. Adler's report did not mention class size and, "[i]nterestingly," Dr. Adler did not testify at the IHO Hearing to explain her recommendations or her findings. (IHO Decision at 14). Conversely, "the District's witnesses all provided extensive testimony regarding the appropriateness of the recommended program." (Id.). Ultimately, citing extensive case law, the IHO concluded the Parents' disagreement with the District's placement recommendations did not amount to a denial of meaningful participation in the IEP process.

After determining the 2019–2020 and 2020–2021 IEPs were procedurally adequate, the IHO addressed the Parents' claim that the IEPs were substantively inadequate because the goals and program recommendations did not go far enough to address A.D.'s needs, and thus were not reasonably calculated to enable A.D. to make meaningful progress.

For both school years, the IHO concluded the IEPs were likely to produce progress, even if they did not offer "the best possible" program, and thus satisfied the standard for a FAPE. (IHO Decision at 26).

Regarding the goals listed in the IEPs, the IHO acknowledged Dr. Soifer's testimony concerning goals that would have been "more" appropriate, but found the CSE recommended several goals to address A.D.'s needs. (IHO Decision at 20). The IHO cited "uncontroverted testimony" that A.D.'s "present levels of performance were put on the whiteboard and discussed extensively, and there were vigorous discussions regarding the various goals." (Id. at 19). The IHO also noted the CSE added, removed, and revised goals based upon input from Dr. Adler, the Windward representative, and the Parents. The IHO said the CSE should have further discussed A.D.'s ADHD diagnosis and developed related goals, but acknowledged the CSE recommended accommodations and modifications to address A.D.'s needs for refocusing, redirection, and prompting. Accordingly, the IHO found it was "clear that the CSE Team went through the evaluations and reports, determined [A.D.'s] present levels of performance and recommended numerous goals to address" the Parents' concerns, such that the goals set in the IEPs did not deny A.D. a FAPE. (Id. at 20).

Regarding program recommendations, the IHO determined the IEPs for both years offered A.D. a program in the least restrictive environment that was reasonably calculated to enable her to make educational progress. In reaching her decision, the IHO considered Dr. Soifer's testimony that A.D. required a structured, homogenous program in a specialized setting, which the IHO found "somewhat credible." (IHO Decision at 22). However, the IHO placed greater weight on the testimony of the District's witnesses, noting "[e]very one of the District's witnesses credibly testified as to the appropriateness of the recommended program, providing

13

specific information" on how the recommendations would be implemented and how various goals would be addressed.  (Id. at 24).  She cited testimony from District witnesses explaining the rationale for certain recommendations, as well as adjustments to the recommendations based upon "reports, evaluations and teacher and parent concerns."  (Id. at 25).   The IHO further found the CSE's decision to provide services at a District school was supported by the record.

Having determined the District offered A.D. a FAPE for both years, the IHO denied the Parents' request for tuition reimbursement.  Nonetheless, she analyzed the other two requirements for reimbursement.  With respect to appropriateness of the unilateral placement, the IHO noted the District conceded Windward was an appropriate placement.  With respect to equitable considerations, the IHO noted that for both years the Parents sent their ten-day notices to the District after contractually committing to pay Windward the entire year's tuition.  Based on this commitment, the IHO concluded the Parents would not have accepted any District program, and therefore, had a FAPE not been offered (making the Parents eligible for private tuition reimbursement), the Parents would only be entitled to fifty percent reimbursement.

B.  SRO Review

The Parents appealed the IHO Decision to the SRO, challenging the IHO's findings related to predetermination and the substantive appropriateness of the IEPs.  The Parents also argued they were entitled to full tuition reimbursement.

In response, the District argued the IHO's decision should be upheld in its entirety, except with respect to the IHO's analysis concerning tuition reimbursement.  The District contended that even if it had not offered a FAPE, equitable considerations warranted a full denial of reimbursement.

The SRO, Sarah L. Harrington, concluded the record supported the IHO's determination that the District offered A.D. a FAPE for the 2019–2020 and 2020–2021 school years.  As such, she concluded the Parents were not entitled to tuition reimbursement.

Regarding the alleged predetermination, the SRO agreed with the IHO that the Parents "had a full opportunity to participate in the development of [A.D.]'s IEPs" and the District "had the requisite open mind."  (SRO Decision at 10).  The SRO noted the CSE held multiple meetings over both school years, reconvening at the Parents' request, and revised the IEPs based on feedback from the parents and Dr. Adler, as well as further testing.  The SRO also noted the September 2019 CSE meeting summary "memorialized the reasons for the CSE's decision not to recommend" an ICT class for science and social studies, "which were related to [A.D.'s] needs and not the availability of such classes in the district."  (Id. at 10 n.6).

Regarding the Parents' argument that A.D. "required significant direct instruction in all academic areas" for the 2020–2021 school year, the SRO determined "the parents' allegation that the IEPs did not include direct instruction is without merit."  (SRO Decision at 13–14).  The SRO noted, for example, the October 2020 IEP recommended a 12:1+1 special class in math and ELA, including "two periods daily of intensive direct instruction using" a PAF program and an "intensive comprehension and language development class."  (Id. at 13–14.)  The SRO also cited testimony regarding the suitability of this program for A.D., who "really required the decoding and encoding, the spelling approach, [and] the multisensory approach" as well as specialized instruction for comprehension.  (Id. at 13).  In addition, the SRO noted "the CSE determined that the indirect consultant teacher and teaching assistant cluster for science and social studies within the mainstream classroom continued to be appropriate."  (Id. at 14).

The SRO further noted the IHO considered Dr. Soifer's testimony that A.D. needed a small, structured program like that at Windward, but accorded greater weight to the testimony of the District's witnesses, which the IHO found more credible.  The SRO concluded the record supported the IHO's "well reasoned" determination that "the CSEs recommended appropriate programs and services reasonably calculated to enable [A.D.] to make progress," and therefore the District offered A.D. a FAPE for the 2019–2020 and 2020–2021 school years.  (SRO Decision at 14).

Because the SRO determined the District offered A.D. a FAPE for each year at issue, she did not reach the question of whether equitable considerations supported the Parents' request for reimbursement.

## DISCUSSION

I.    Standard of Review

In federal court, parties seeking review of administrative decisions in cases brought under the IDEA usually do so by motion for summary judgment.  See Viola v. Arlington Cent. Sch. Dist., 414 F. Supp. 2d 366, 377 (S.D.N.Y. 2006).  However, unlike in an ordinary summary judgment motion, the existence of a disputed issue of material fact will not necessarily defeat the motion.  Id.  Rather, summary judgment in an IDEA case functions as an appeal from an administrative decision.  T.P. v. Mamaroneck Union Free Sch. Dist., 554 F.3d 247, 252 (2d Cir. 2009) (per curiam).

In this context, the Court:  (i) reviews the record of the administrative proceedings; (ii) hears additional evidence at the request of a party; and (iii) grants such relief as it deems appropriate based on the preponderance of the evidence.  20 U.S.C. § 1415(i)(2)(C).

"[T]he role of the federal courts in reviewing state educational decisions under the IDEA is circumscribed."  Gagliardo v. Arlington Cent. Sch. Dist., 489 F.3d 105, 112 (2d Cir. 2007). The standard of review "requires a more critical appraisal of the agency determination than clear-error review but nevertheless falls well short of complete de novo review."  M.H. v. N.Y.C. Dep't of Educ., 685 F.3d 217, 244 (2d Cir. 2012).

"[T]he deference owed to an SRO's decision depends on the quality of that opinion." R.E. v. N.Y.C. Dep't of Educ., 694 F.3d at 189.  "Reviewing courts must look to the factors that normally determine whether any particular judgment is persuasive, for example, whether the decision being reviewed is well-reasoned, and whether it was based on substantially greater familiarity with the evidence and the witnesses than the reviewing court."  Id.  The Second Circuit's approach requires district courts to consider the following:

> [D]eterminations regarding the substantive adequacy of an IEP should be afforded more weight than determinations concerning whether the IEP was developed according to the proper procedures.  Decisions involving a dispute over an appropriate educational methodology should be afforded more deference than determinations concerning whether there have been objective indications of progress.  Determinations grounded in thorough and logical reasoning should be provided more deference than decisions that are not.  And the district court should afford more deference when its review is based entirely on the same evidence as that before the SRO than when the district court has before it additional evidence that was not considered by the state agency.

M.H. v. N.Y.C. Dep't of Educ., 685 F.3d at 244.

Moreover, "[d]eference is especially appropriate" when the SRO agreed with the IHO's ruling.  A.A. v. N.Y.C. Dep't of Educ., 2015 WL 10793404, at *10 (S.D.N.Y. 2015); B.K. v. N.Y.C. Dep't of Educ., 12 F. Supp. 3d 343, 360 (E.D.N.Y. 2014) ("[D]eference is particularly apt where the IHO and SRO decisions are in agreement and are based on the same record as that before the district court.").

Ultimately, "federal courts reviewing administrative decisions must give due weight to these proceedings, mindful that the judiciary generally lacks the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy." M.H. v. N.Y.C. Dep't of Educ., 685 F.3d at 240. Courts may not "make subjective credibility assessments," or "choose between the views of conflicting experts on controversial issues of educational policy in direct contradiction of the opinions of state administrative officers who had heard the same evidence." Id.

II.     Adequacy of IEPs

To decide whether an IEP is adequate under the IDEA, courts follow a two-part test. See Bd. of Educ. of the Hendrick Hudson Cent. Sch. Dist. v. Rowley, 458 U.S. at 206–07. First, courts examine the procedural adequacy of the IEP, asking "whether the state has complied with the procedures set forth in the IDEA." R.E. v. N.Y.C. Dep't of Educ., 694 F.3d at 190. Not all procedural violations render an IEP inadequate, however. Id. Instead, an IEP is procedurally inadequate only if the violations, individually or cumulatively, "impeded the child's right to a FAPE, significantly impeded the parents' opportunity to participate in the decisionmaking process, or caused a deprivation of educational benefits." Id.

Second, courts examine the substantive adequacy of the IEP to determine whether "an IEP [is] reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. RE-1, 580 U.S. 386, 399 (2017). "Any review of an IEP must appreciate that the question is whether the IEP is reasonable, not whether the court regards it as ideal." Id. "The IEP must aim to enable the child to make progress. After all, the essential function of an IEP is to set out a plan for pursuing academic and functional advancement." Id. Indeed, a school district is not required to provide

"every special service necessary to maximize each handicapped child's potential." Bd. of Educ. of the Hendrick Hudson Cent. Sch. Dist. v. Rowley, 458 U.S. at 199.  "[C]hallenges to a school district's proposed placement school must be evaluated prospectively (i.e., at 'the time of the parents' placement decision') and cannot be based on mere speculation." M.O. v. N.Y.C. Dep't of Educ., 793 F.3d 236, 244 (2d Cir. 2015).

Moreover, "[b]ecause the law expresses a strong preference for children with disabilities to be educated, to the maximum extent appropriate, together with their non-disabled peers, special education and related services must be provided in the least restrictive setting consistent with a child's needs." Walczak v. Fla. Union Free Sch. Dist., 142 F.3d at 122; 20 U.S.C. § 1412(a)(5)(A).

Because every child is unique, "determining whether a student has been placed in the 'least restrictive environment' requires a flexible, fact-specific analysis." P. ex rel. Mr. & Mrs. P. v. Newington Bd. of Ed., 546 F.3d 111, 113 (2d Cir. 2008).  "Pursuant to that test, a court should consider, first, whether education in the regular classroom, with the use of supplemental aids and services, can be achieved satisfactorily for a given child, and, if not, then whether the school has mainstreamed the child to the maximum extent appropriate." Id. at 120.  "Only 'when the nature or severity' of a child's disability is such 'that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily' should a child be segregated." Walczak v. Fla. Union Free Sch. Dist., 142 F.3d at 122 (quoting 20 U.S.C. § 1412).

III.   Application

The Parents contend the IEPs for both school years were procedurally and substantively inadequate.  They assert three primary arguments.  First, regarding procedural adequacy, the Parents argue the record shows the District predetermined A.D.'s placement, and the Court need

not defer to the SRO's contrary finding.  Second, regarding substantive adequacy, they argue the record shows A.D. needed a full-time special education class to progress.  Third, regarding equitable considerations for reimbursement, they argue they should be fully reimbursed because the District had ample opportunity to address the Parents' concerns before they committed to Windward.

The District, on the other hand, contends the Court should defer to the SRO's decision finding for the District, which the District argues is well-reasoned, thorough, and supported by a preponderance of evidence in the record.  The District also contends the Court need not reach the question of whether equitable considerations warrant reimbursement because the IEPs offered by the District were adequate.

The Court agrees with the District.

A.    Procedural Adequacy

The Parents contend the District failed to provide procedurally adequate IEPs for both years because the District predetermined A.D.'s placement.

As an initial matter, "a lesser degree of deference is owed to the SRO" on the issue of predetermination because "one need not have a background in education or educational policy to consider and determine whether the CSE had an open mind going into" the meetings.  G.S. v. Pleasantville Union Free Sch. Dist., 2020 WL 4586895, at *11 (S.D.N.Y. Aug. 10, 2020).  That said, "deference is particularly appropriate when the state officer's review has been thorough and careful," as it was here.  See id. (providing deference to SRO's decision on predetermination).  The SRO thoroughly reviewed and discussed the facts in the record, including the CSE meeting summaries, the IEPs themselves, and testimony at the IHO hearing, and reviewed relevant legal authority.  Furthermore, deference is "particularly apt" here because the SRO and IHO, based on

the record now before the Court, agreed the IEPs were procedurally adequate.  B.K. v. N.Y.C.
Dep't of Educ., 12 F. Supp. 3d at 360.  Accordingly, the Court concludes the SRO's
determination on predetermination is entitled to deference.

The Court also concludes the procedural adequacy of the IEPs is supported by a
preponderance of evidence in the record.

As the SRO explained, the record pertaining to CSE meetings during 2019 and 2020
shows the District had the requisite open mind and allowed the Parents to participate
meaningfully in the development of the IEPs, even though "the District staff ultimately disagreed
with the opinions of [the Parents] and their outside professionals."  See P.K. ex rel. P.K. v.
Bedford Cent. Sch. Dist., 569 F. Supp. 2d 371, 383 (S.D.N.Y. 2008).  The Parents attended all
CSE meetings, voiced their concerns about the CSE's recommendations, and provided
information that the CSE considered in developing the IEPs.  The Parents also brought Dr. Adler
to the September 2019 meeting, during which Dr. Adler presented her findings and
recommendations to the CSE.  Consequently, the CSE revised the IEP to include a teaching
assistant cluster for science and social studies, as well as various supports recommended by Dr.
Adler.  And in 2020, after hearing from the Parents and a Windward representative, reviewing
progress reports and testing data from Windward, and conducting additional evaluations, the
CSE further revised its recommendations, eventually proposing A.D. be placed in a special class
for math and ELA.

In light of this evidence, the Court concludes the SRO properly found the CSE did not
predetermine A.D.'s placement and allowed the Parents to meaningfully participate in the
development of the IEPs.  See J.P. ex rel. J.P v. City of N.Y. Dep't of Educ., 717 F. App'x 30, 32
(2d Cir. 2017) (summary order) (no predetermination when the "CSE heard [parents'] objections,

21

considered materials they submitted, and convened a second meeting to address their objections and explain its reasoning").

The Court is not persuaded by the Parents' arguments to the contrary.  That the District continued to recommend a general education class for science and social studies, after the Parents expressed concerns about that placement, does not mean the District had an "unofficial policy" of refusing to provide special education or co-teach classes for those areas.  (Cf. Doc. #18 ("Pl. Mem.") at 13).  Rather, the CSE meeting summaries and IHO hearing testimony from multiple District witnesses show the CSE considered the Parents' concerns but continued to believe the District's recommended placement was appropriate, particularly in light of the strong preference for educating children in the least restrictive environment and A.D.'s grade-level performance in science and social studies.  Based on this factual record, Court "cannot simply assume that the [District's] decision to rely heavily on" general education classes with various supports "is necessarily inappropriate," especially given the District's "broad discretion to adopt programs" it finds effective.  M.H. v. N.Y.C. Dep't of Educ., 685 F.3d at 257.

Nor does Ms. Santangelo's testimony that, during her time in the District, third grade students have not needed an ICT class for science and social studies support the existence of an unofficial District policy of refusing to provide such a program.  See M.H. v. N.Y.C. Dep't of Educ., 685 F.3d at 257 (rejecting predetermination claim because "testimony that as far as [the district representative] knew, only 6:1:1 programs were provided by the district . . . . does not tend to establish that the district would not consider a 1:1 placement in an appropriate case").  Indeed, the IHO found Ms. Santangelo credibly testified the District would have provided an ICT or special class for science and social studies if a student needed one.  The Parents offer no evidence to the contrary, only their opinion, based on "common sense," that Ms. Santangelo's

testimony was not credible.  (Doc. #31 ("Pl. Reply") at 2–3).  As such, the Court defers to the

finding made by the IHO, who, "having conducted the hearing and relying on [her] educational

expertise," credited Ms. Santangelo's testimony.  Scott ex rel. C.S. v. N.Y.C. Dep't of Educ., 6

F. Supp. 3d 424, 444 (S.D.N.Y. 2014); M.H. v. N.Y.C. Dep't of Educ., 685 F.3d at 255 ("The

IHO's determination was based on his assessment of the credibility of the witnesses testifying

before him. . . .  It was entitled to deference on that basis.").

Accordingly, giving due weight to the SRO Decision and the IHO's credibility

assessment, and based on the Court's independent examination of the record, the Court

concludes the IEPs for both years were procedurally adequate.

      B.     <u>Substantive Adequacy</u>

The Parents contend the District failed to provide substantively adequate IEPs for both

years because A.D. needed a full-time special education class to progress.

Here, the SRO's determination that the IEPs were reasonably calculated to enable A.D. to

progress is entitled to deference.  As noted above, the record before the Court is the same as that

before the SRO and IHO, the SRO agreed with the IHO's conclusion, this claim turns on the

substantive adequacy of an IEP, and the SRO thoroughly reviewed, relied on, and discussed the

factual record and relevant legal authority.  See K.L. ex rel. M.L. v. N.Y.C. Dep't of Educ., 530

F. App'x 81, 85–86 (2d Cir. 2013) (deferring to SRO Decision regarding substantive adequacy

as "precisely the kind of educational policy judgment to which [the court] owe[s] the state

deference if it is supported by sufficient evidence").

The Court also concludes the substantive adequacy of the IEPs is supported by a

preponderance of evidence in the record.

The Court examines each school year in turn.

1.    2019–2020 School Year (Third Grade)

Both IEPs for the 2019–2020 school year recommended placing A.D. at a District school in an ICT class for math and ELA and a general education class for science and social studies. The CSE also recommended services including specialized math and reading instruction and speech-language therapy, and ultimately, the additional support of a teaching assistant cluster during science and social studies, as reflected in the September 2019 IEP.  In developing its recommendations, the CSE considered evidence including Dr. Adler's neuropsychological evaluation, progress reports from A.D.'s teachers and speech-language therapist, and the results of assessments performed by the District.  (D-11 at 6–13).

A.D.'s teachers reported she made "considerable" progress during second grade, when she was in a general education class and received fewer services compared to the 2019–2020 IEPs.  (D-11 at 2).  Testing results reflected her "extraordinary growth" in reading and math during this period.  (Id.; Tr. at 33–39).  And A.D.'s second grade report card noted "grade level performance" in science and social studies.  (D-11 at 2).  The general education teacher reported A.D. was "an active participant" in the science curriculum and "did not require a high level of teacher support during these times."  (Id. at 2–3).  The teacher further noted A.D. "benefited from small group instruction within the classroom" as well as a multi-sensory reading program used throughout the year.  (Id. at 2).  This evidence supports a finding that the IEPs for 2019–2020, which offered A.D. more support than she had in second grade, would enable her to make meaningful progress.

Finally, the SRO concluded—and the IHO credited testimony that—A.D.'s needs could be met by the District's recommended program and services.  (SRO Decision at 13–14; IHO Decision at 24–26; Tr. at 272, 284, 402).

Accordingly, giving due weight to the SRO Decision and the IHO's credibility assessments, and based on the Court's independent examination of the record, the Court concludes the District's recommended programs and services were reasonably calculated to enable A.D. to access educational benefits in the least restrictive environment consistent with her needs, and therefore provided A.D. with a FAPE.

2.    2020–2021 School Year (Fourth Grade)

The first two IEPs for the 2020–2021 school year continued to recommend an ICT class for math and ELA and a general education class for science and social studies, with several services and supports.  After conducting further testing in September 2020, the CSE determined A.D. "would benefit from a more intensive program to develop her reading and decoding skills," as well as additional support in math.  (D-2 at 2–3).  Accordingly, the CSE changed the recommended placement to a special class for math and ELA, with intensive direct reading instruction using the same PAF program as Windward.  In developing its recommendations, the CSE considered evidence including progress reports from Windward, the results of assessments performed by the District and Windward, and prior educational and psychological evaluations. (Id. at 7–16).

The evidence before the CSE showed A.D. was making some progress in her small classes at Windward.  In most areas, she scored either a "1. Consistently" or a "2. Frequently" on her February 2020 progress report (P-BB) and "Demonstrates progress" on her 2020 end-of-year report (P-CC).[5]  However, A.D. continued to struggle with decoding, fluency, spelling, written expression, math word problems, recall of math facts, listening comprehension, and following

---

[5]    Windward adopted new "performance indicators" in spring 2020 due to COVID-related instructional changes.  (P-CC at 1).

multi-step directions.  (P-BB; P-CC; D-8 at 2).  The progress reports also indicated A.D. experienced some difficulty with concepts and skills in social studies and science, although she showed improvement in several areas.  (P-BB at 5–6; P-CC at 4).  In addition, A.D. consistently followed classroom instructions and maintained attention.  (P-BB at 2, 4).

During the May 2020 CSE meeting, the Windward representative advised the CSE that A.D. "benefits from a high level of teacher support in reading," and "needs prompts to use spelling skills" and to expand her written expression.  (P-F at 2).  With respect to math, the representative reported A.D. "benefits from direct teaching and modeling in math and a multisensory approach" and "needs repetition, reteaching and spiraling review of previously taught concepts."  (Id.).

Citing testimony from several witnesses the IHO found credible, the SRO and IHO concluded A.D.'s particular needs could be met by the District's recommended programs and services for the 2020–2021 school year.  (SRO Decision at 13–14; IHO Decision at 24–26; Tr. at 422, 433, 488, 536, 544).  For example, as the IHO noted, "evaluators['] recommendations for a multi-sensory approach and proper training were incorporated as [A.D.'s] teacher was trained by Windward and was trained in Orton-Gillingham and the speech therapist was trained by Parents' witness, Dr. Soifer."  (IHO Decision at 25).

That Dr. Soifer—whose testimony the IHO found only "somewhat credible"—opined Windward's special class would be a more appropriate placement for A.D. does not mean the District's proposed placement was inappropriate.  (IHO Decision at 22–23).  Although the Parents, understandably, want "the best possible program" for their child (id. at 22), the IDEA guarantees only a program that confers educational benefits, not one that maximizes the student's potential or "provides everything that might be thought desirable by loving parents."  Walczak v.

26

<u>Fla. Union Free Sch. Dist.</u>, 142 F.3d at 132–33.  There is sufficient evidence here to find A.D. could receive educational benefits without a full-time special education program.

Accordingly, giving due weight to the SRO Decision and the IHO's credibility assessments, and based on the Court's independent examination of the record, the Court concludes the District's recommended programs and services for the 2020–2021 school year were reasonably calculated to allow A.D. to access educational benefits in the least restrictive environment, and therefore provided A.D. a FAPE.

C.      <u>Reimbursement</u>

Because the Court concludes the District offered A.D. a FAPE for the 2019–2020 and 2020–2021 school years, the Court does not reach the questions of whether the Parents' enrollment of A.D. at Windward was appropriate or whether equitable considerations support their tuition reimbursement claim.  <u>See</u> <u>M.C. ex rel. Mrs. C. v. Voluntown Bd. of Educ.</u>, 226 F.3d 60, 66 (2d Cir. 2000).

## CONCLUSION

The Parents' motion for summary judgment is DENIED.

Accordingly, the decision of the SRO is AFFIRMED and the complaint is dismissed.

The Clerk is instructed to terminate the pending motion (Doc. #18) and close this case.

Dated:  February 7, 2023
        White Plains, NY

SO ORDERED:

_____
Vincent L. Briccetti
United States District Judge